## Town of Alburg v. Rutland Railway Corporation

[129 A2d 506]

January Term, 1957.

Present: **Jeffords, C. J., Cleary, Adams, Hulburd and Holden, JJ.**

Opinion Filed February 5, 1957.

*Edwin W. Lawrence* for the defendant.

*John G. Kissane* for the plaintiff.

**Hulburd, J.** The plaintiff town is seeking to collect taxes assessed by it for the years 1950, 1951 and 1952 on a certain building, known as the "Y" building, belonging to the defendant railway corporation. The parties in this case have stipulated that "the principal question is whether or not the property sought to be taxed by the Town of Alburg was property exempt from taxation by said Town of Alburg by Chap. 48 of the Vermont Statutes Revision of 1947." The parties have further stipulated as follows: "Said premises were acquired in 1924 by the Rutland Railroad Company for the purposes of maintaining a place where its employees might have lodging and restaurant facilities. They were operated for such purposes first by a Y. M. C. A. organization which was supported by said Rutland Railroad Company, then by a Receiver and then by its Trustees in Bankruptcy until 1948, and that since December 31st 1949, they have been operated by individuals as stated below.

"On January 1st 1949, said premises were occupied and used by Edward Blair under an agreement with the Trustees of the Rutland Railroad Company that he would use them for maintaining a restaurant and rooms for lodging, with the right to sell eatables of all kinds, cigars, cigarettes, tobacco, magazines, periodicals, etc., but not any spirituous liquors. He paid nothing to the Trustees by way of rental or otherwise and the Trustees agreed to and did furnish him and pay for pyrofax, electricity, coal and water used by him.

"Blair agreed to occupy and use the premises at his own cost and expense, except for the above items.

"The Trustees agreed to pay all taxes and insurance.

"On or about March 13th 1950, Frank E. Hart began

occupying and operating said premises under the same terms as said Blair had.

"On or about May 2nd 1951, H. E. Dishaw began occupying and operating said premises on the same terms as said Hart had and has continued to occupy and operate them upon the same terms.

"November 1st 1950, the said Trustees conveyed all of the property of the Rutland Railroad Company to the Rutland Railway Corporation, including said premises,

"Attached hereto and made a part hereof are statements showing amounts expended by the said Trustee and the Rutland Railway Corporation during the years 1950, 51 and 52, pursuant to the terms under which said premises were occupied and operated by the above named men.

"The parties reserve the right to introduce evidence tending to prove other material facts and the facts above set out may be used for any purpose during Trial."

The parties availed themselves of the right reserved in the stipulation. Both produced testimony in a hearing before the court. The court made findings of fact to some of which exceptions were taken by the defendant. The defendant further excepted to the court's failure to find certain facts as requested. Upon judgment being entered against the defendant, it duly excepted thereto on a number of specified grounds.

The following findings, to which no exception was taken and briefed, by the defendant, were made by the court:

1. The premises were acquired in 1924 by the Rutland Railroad Company for the purposes of maintaining a place where its employees might have lodging and restaurant facilities. They were operated for such purposes by a Y. M. C. A. Organization which was supported by said Rutland Railroad Company, then by a Receiver and then by its Trustees in Bankruptcy until 1948, and that since December 31st, 1949, they have been operated by individuals as stated below.

2. On the 15th day of June, 1948, a lease agreement covering the premises in issue was entered into between the trustees of the Rutland Railroad Company and Reginald D. Stearns. (Plff's. Ex. 6.) This lease provided

"That the Lessee shall use the house for maintaining a restaurant and rooms for lodging, the right to sell eatables of all kinds, cigars, cigarettes and tobacco, magazines and periodicals, etc., provided, however, that this indenture shall not confer upon the lessee any right to sell or otherwise dispose of malt or spirituous liquors of any kind whatsoever upon or about the said premises."

The lease further provided:

"That the lessee shall at his own cost and expense, operate said premises and maintain and keep in good repair the interior of the house located thereon and shall repair and maintain the barn and shed should he desire to use the same."

3. The lease provided for a rental of Fifty Dollars ($50.00) per month to be paid in advance.

4. The Trustees agreed to pay all taxes and insurance.

5. On September 8, 1948, a letter was written to the Lessee, Reginald D. Stearns, modifying said lease commencing September 1, 1948, to the extent that the rental was reduced to Twenty-five Dollars ($25.00) per month to include fuel for heating the building and for heating water and the cost of electric lights. (Plff's. Ex. 1.)

6. On October 30, 1948, the railroad by letter to R. D. Stearns eliminated the monthly rental of Twenty-five Dollars, ($25.00.) (Plff's. Ex. 2.)

7. On December 13, 1948, the railroad sent a letter to Reginald D. Stearns permitting assignment of the aforementioned lease to Edward Blair with the stipulation that he accept the terms of the agreement and be governed thereby. And further that the lease and its terms had been modified by the aforementioned letters of September 8 and October 30. (Plff's. Ex. 3.)

9. On May 8, 1951, the railroad sent a letter to Mr. H. E. Dishaw indicating that Mr. Dishaw had occupied the premises

since December 1, 1950, and making effective an assignment of the lease as of November 1, 1950, with the understanding that Dishaw would continue to occupy the premises mentioned in the lease under the same terms as covered therein, having in mind the modifications which had been made subsequent to the execution of the agreement. (Plff's. Ex. 5.)

10. On or about May 2, 1951, H. E. Dishaw began operating and occupying said premises under the same terms as said Hart and has continued to operate and occupy them upon the same terms.

11. The lease hereinabove referred to contains no provision that would require the lessee to furnish board and/or lodging for any employee of the railroad, nor does said lease in any way prohibit the lessee from offering board and/or lodging to any member of the general public.

13. The property involved in this case is land and a building thereon in Alburg, Vermont, owned by the Rutland Railway Corporation during the years 1950, 1951 and 1952, excepting that until November 1, 1950, it was owned by the Rutland Railroad Company, which was in possession of Trustees in Bankruptcy of said Rutland Railroad Company.

14. The building is near the railroad station. The rooms in the building are a restaurant, recreational room, toilets and showers, and for lodging, four single rooms and two large dormitory rooms, containing 18 beds in all.

15. During the period involved, pursuant to said agreements, the Trustees and defendant paid for supplies and other items specified in the agreements with said persons the following amounts:

For the year 1950, $2,240.58
1951, $3,803.87 and
1952, $3,066.56.

16. Alburg is a terminal station for trains running between it and Rutland and it and Ogdensburg, New York, and intermediate points, such as Malone, New York and Norwood, New York. Train crews working into and out of Alburg lay

over there from 12 to 21 hours. For those members of the various train crews laying over in Alburg who did not live in or about Alburg, it was necessary for them to procure board and lodging in Alburg.

18. There were an engine house and terminal, and a freight yard at Alburg, in which a number of men were employed, who used the restaurant and occasionally the rooms for lodging.

19. That there is located very near the railroad terminal a hotel known as the "Alburg Inn", which caters to the general public, both as to rooms and serving meals. The "Alburg Inn" has as great a capacity as the "Y" building.

20. That some of the railroad personnel have in the past been accommodated at the "Alburg Inn".

21. That there are other restaurants in the Village of Alburg within four hundred feet of the so-called "Y" building which cater to the general public and are open from early in the morning until late at night.

22. That the operator of the "Y" property advertises the restaurant and solicits patronage from the general public. It also furnishes lodging to the general public. The same charges are made to the general public as are made to railroad men.

23. That the railroad men that do use the facilities of the "Y" building are principally train crews.

24. That many of the train crews working for the Rutland Railway Corporation live in and about Alburg and thus do not use the facilities of the "Y" building.

25. The majority of the users of both the restaurant and the lodging facilities of the building are railroad employees.

26. The Railway does not furnish facilities, such as is furnished by the "Y" building, in Ogdensburg or in Rutland, which are also terminals of the Rutland Railway.

27. The Railway does not insist that its employees use the facilities of the "Y" and some employees do obtain their meals and lodging elsewhere in Alburg.

28. If this property is used for railroad purposes it was included in the appraisal of real estate of railroad property by the Commissioner of Taxes as provided by section 1014, etc., of the Vermont Statutes Revision of 1947. The appraisal made by the Commissioner of Taxes pursuant to said statutes during those years was a general appraisal and no specific exclusion or inclusion of the "Y" property was made.

Before going further it is necessary to have before us the statutory provisions which bear on this case. Chapter 48 of the Vermont Statutes Revision of 1947 pertains to the taxation of corporations. Section 1050 of this chapter, as amended by No. 27 of the Laws of 1949, provides as follows:

> "1050 *Exemption from local taxation.* Except as otherwise provided, the following property shall not be set in the grand list to the owner thereof: (1) real and personal estate used in operating a railroad * * * * and appraised under sections 1014, 1015 and 1016. * * * * "

These sections last referred to are sections under which the state tax commissioner proceeds in collecting a state tax assessed by section 1002 of the chapter. They read as follows:

> "1013. *Definition.* The words "property acquired, constructed, or used for railroad business or purposes" as used in this chapter and except as otherwise provided, shall include all franchises, rights of way, roadbeds, tracks, bridges, stations, terminals, rolling stock, equipment and all other real and personal property of whatever character used or employed in the operation of a railroad or in conducting its business, and shall include all title and interest in such property as owner, lessee or otherwise."

> "1014. *Appraisal, method; new appraisal; property not included.* 1. The commissioner shall appraise at its fair and just value all property acquired, constructed or used for railroad business or purposes held, possessed or owned by a person or corporation operating a railroad located entirely within this state."

There follows in this section certain provisions applicable where the railroad in question is only partly within the state. These provisions need not concern us here as they in no way affect the problem before us. The section concludes with the following pertinent provision:

> "VI. The aforesaid appraisals shall not include the following classes of property owned by railroad companies: tenement houses and the lands whereon the same are located; lands or buildings leased to or occupied by another person or corporation for other than railroad purposes; timber, farming, meadow or pasture lands and water power or electric plants not used for railroad purposes."

The basic question here is whether under the statute the nature of the property, its use, and its purpose are such that it may properly be subject to local taxation or whether it is subject to a state tax only because its nature and the purpose of its use bring it within the statutory classification of railroad property. Thus, state and local taxation are mutually exlusive in this regard. To this effect is the language of V. S. §1034 as amended by No. 27 of the Acts of 1949:

> "1034. *Appraisal; time.* On or before December 31, in each even year the commissioner shall appraise the rights, property and corporate franchise of such Company, except such property as may be subject to local taxation, at its fair and just value * * * * "

We now return to the findings made by the court below in this matter. In addition to those already quoted, certain others were made to which the defendant excepted. A pair of such findings are No. 29 and No. 30. The two of them should be considered together since the former is quite evidently used as a premise on which the latter is founded. These findings read as follows:

"29. That the use of the "Y" building in question, so-called, in the town of Alburg, is a convenience for the defendant and for its employees, but not a necessity in the operation of a railroad.

"30. That the defendant does not use the property in question in its own business as a part of the procedure of operating a railroad."

In effect, the court below found that the use of the "Y" building was a convenience for the defendant but not a necessity in the operation of a railroad and then went on and found on that basis that the defendant can not be said to be using the property as a part of the procedure of operating a railroad. The defendant's position by its exception to finding 29 and by its exception to the judgment is, first, that the finding as to lack of necessity is not supported by the evidence and secondly that even if it is, that necessity is not the test and that the judgment order cannot be justified on the facts found.

It becomes important, then, to determine what test is to be applied. When, under the statute, can a piece of property be said to be used in the operation of a railroad or in conducting its business as distinguished from "other than railroad purposes?" The plaintiff has cited the case of *State* v. *Commissioners of Mansfield*, [1852], 23 NJL 510, 57 Am Dec 409. In this case a railroad owned certain dwelling houses and lots of land, situated near the railroad line, which were used exclusively by workmen and mechanics in the employ of the railroad. The plaintiff in support of its position quotes the following from the above case: "There must be a limit somewhere to this incidental power of the company to enlarge its operations and extend its property without taxation under this exempting clause, and that limitation, I think, must be fixed where the necessity ends, and the mere convenience begins. The necessary appendages of a railroad and transportation company are one thing, and those appendages which may be convenient means of increasing the advantages and profits of the company are another thing. It must be advantageous for the company to purchase land, and to erect houses in the right location and of the right kind for all their constant employees, to establish factories for making their own rails, engines, and cars, even to purchase coal mines and supply themselves with fuel; but these are not among the necessary powers of such a company * * * "

"Upon principle, we must affirm the assessment made by the assessor of the township of Mansfield. These dwelling-

houses and lots for the accommodation of the workmen of the company are not necessary appendages of a railroad or of a transportation business; they are convenient appendages, no doubt, but nothing more. Nor are they within the limits authorized to be appropriated by the company. The legislature, in exempting the company from all other taxes except the transit duties, only intended to include so much property as was necessary and essential to a railroad and a transportation business, such as the corporation was created to construct and carry on."

Without trying to distinguish this case factually from the instant case,—something which we think can be done, we turn our attention directly to the principles that it lays down. The first is that "there must be a limit somewhere" or a criterion as to what constitutes using property in the operation of a railroad or in the conducting of its business. With this we agree. The opinion then proceeds to fix upon necessity as opposed to mere convenience as the discriminating factor.

Let us acknowledge at the outset that it is difficult to lay down any one test which will determine in all circumstances how a user falls under the statute. Circumstances and conditions may be so varied and complex that it is difficult to make them all yield to one rule. In any event we are unwilling to adopt the principle of the New Jersey case and it would seem not to be in accord with the test indicated in our own cases. In *Town of Bristol* v. *Bristol Railroad Company*, 91 Vt 223, 100 A 37, the question raised was whether three separate pieces of real estate were each taxable locally under the statute which was not materially different from the present law. One of the pieces consisted of a lot with a stable near the defendant's tracks. The defendant owned a horse and necessary equipment for the delivery of odd pieces of freight. At some previous time the horse had been kept in the stable, but after a little it was kept by an employee at a stable of his own and only the equipment continued to be kept in the railroad stable. The railroad stable was used by one of the defendant's officers who ran a coal business who kept a team and equipment for handling it. This team and equipment it kept in the defendant's stable. The coal dealer paid no rent but he frequently rendered services to the defendant with his team without charge. On this state of

facts this Court stated as follows at p. 227: "The defendant insists that any use by the railroad for its own purposes would prevent taxing this property locally, but we think that railroad use must be of substantial and controlling character to have that effect. [Citing *Montpelier* v. *Central Vt. Ry. Co.*, 89 Vt 36, 93 A 1047]. Otherwise the most trivial railroad use would predominate over a commercial use of the most decisive character."

■ We think that the true test is whether the use is of substantial and controlling character. This is not the same, nor so exacting, as a test based upon necessity, as opposed to convenience. Had necessity been the criterion, the evidence in the Bristol Railroad case would not have entitled the railroad to go to the jury. The court there held that the question under the evidence was for the jury. In general we may say that the law of eminent domain [where necessity must be shown] is not the criterion. *Frazier* v. *Slack*, 85 Vt. 160, 81 A 161. Compare *Eldridge* v. *Smith*, 34 Vt 484, 494.

In view of what we have said, it is unimportant to determine whether finding No. 29 is supported by the evidence. But the same cannot be said of finding No. 30. In it the court found that the defendant does not use the property in question in its own business as a part of the procedure of operating a railroad. This goes to the heart of the problem. From it the basic question arises: Is this finding supported by the evidence when viewed in the light of the true rule, namely, that such use must be—and neeed only be,—of substantial and controlling character? *Town of Bristol* v. *Bristol R. R. Co.*, *supra*, 91 Vt 223, 227, 100 A 37.

Here we have a railroad company which acquired certain premises at one of its divisional terminals for the purpose of providing suitable lodging and restaurant facilities for its employees who were obliged to "lay over" there from twelve to twenty-one hours at the end of their runs. These facilities as provided, though open to the public, were utilized by railroad employees and they constituted the majority of the users. During the period of time in question, the railroad company not only received no rent or other income from the premises, but, in effect, subsidized their operation at an average cost of

about three thousand dollars a year. We think these salient facts alone are sufficient to sustain the defendant's exception to finding No. 30, as being unsupported by the evidence. The plaintiff has cited the case of *State* v. *St. Paul, M. & M. Ry. Co.*, 42 Minn 238, 44 NW 63. A railroad company built a hotel near its station. It rented the place to an individual who operated it for general hotel purposes. The rent received by the railroad was insufficient to pay carrying charges, but since the guests coming to the hotel had to come over the defendant railroad, their railway fare contributed to the defendant's business. Under this state of facts the court held—and we think quite understandably—that the property was not exempt from local taxation by reason of its use. There the purpose of operating the hotel was not for the accommodation of the railroad employees. The railroad was reaching out for an advantage rather than meeting a problem thrust upon it by normal operation. In the case before us the defendant railway company was dealing with a condition consequent upon the operation of a railroad, namely, of making certain that there was suitable housing for its help when away from home. Proper housing for the employees at the end of a run did not differ essentially from providing an engine house for the locomotive which brought them there. Herein lies the "controlling character" of the use of the building in question and the court below should have so found. We need quote only the following from the transcript in answer to questions put by the court:

"Q. Would it hinder the operation of the Rutland Railroad if this restaurant was not in operation?

A. I believe it would.

Q. And on what do you base your answer?

A. The fact that by having this facility the train crew members are generally together under one roof and available for call when needed. They are being furnished with a place to sleep and eat where they will not be exposed to intoxicants. Thereby I feel they will be in a proper condition when they report to

488

work to insure safety to the public while they are manning trains."

■ The fact that no purpose was expressed in the original lease (as found in finding No. 12) is no basis for finding that the building was not used for railroad purposes where the evidence is all to the contrary. Leases do not ordinarily state the purpose which underlies them. It follows from the foregoing that the defendant's exception to finding No. 30 is sustained and that the court should have found that the premises in question were used for railroad purposes in accordance with the defendant's request so to find. For the same reason it also follows that the exception of the defendant to the judgment is sustained. No reason appearing why a remand in this case is necessary, we will enter the final judgment which would have been inevitable if the defendant's request had been properly complied with. *In re Watkins Estate*, 114 Vt 109, 130, 41 A2d 180, 157 ALR 212. This result renders it unnecessary to pass upon the remainder of the defendant's exceptions.

See 80 ALR 252, 271 for a collection of decisions on this subject. Although cases of this sort are subject to a wide variation of facts, we think our determination here is in harmony with the result reached in most cases which are fairly comparable.

*Judgment reversed and judgment for the defendant to recover its costs.*